The court now calls case number 119-659, People of the State of Illinois v. Matthew Smith Are you ready to proceed? Happily ready? Good morning and may it please the court, counsel. I'm Assistant Attorney General Jason Kriegel. On behalf of the people, the defendant in this case was properly sentenced as a Class X defendant because he was 21 years old at the time he was convicted of aggravated battery, his third serious felony. In my argument this morning, I'd like to address why the text, history, and purpose of the two prior felonies enhancement all support the people's interpretation of that provision. To the extent I have time, I'll also make a couple of points about defendants cross-appeal. But I'd like to begin with the statutory interpretation question. And the analysis there begins with the text of the statute. And people have argued that the enhancement applies to defendants who are 21 when they are convicted because those are the words in the statute, those are the words that the General Assembly chose. The statute directs the sentencing court to impose the enhancement, quote, when a defendant over the age of 21 years is convicted of a third serious felony. And based on that text, that text has meaning because I don't think there's any dispute that if a defendant who was only 20 years old when he was convicted of his third serious felony, the enhancement could not apply to him. So the question, the only possible question, the question in this case, is whether the court should imply some additional requirement. That we have to look back to some earlier point in time to see was the defendant 21 at that time. And to answer that question, we have the cases of this court and the canon of statutory construction that says we don't imply additional limitations or exceptions to statutes that aren't explicitly provided. And in this case, we have In re Griffin and People v. Taylor, which are right on point. Those are both cases involving sentencing statutes with age limitations. And there was no reference in those statutes to some earlier point in time. So the court said that the defendant in those cases had to be 21 at the time they were convicted. I want to say a word about the appellate court's interpretation here, which was that the defendant has to be 21 at the time he's charged with the offense. And the appellate court tried to find a textual hook for its interpretation, and it looked to the word defendant. And I think there are two problems with the appellate court's approach here. The first is that the word defendant just doesn't answer the question. In this case, it tells us who is getting sentenced, but it doesn't tell us when the defendant has to be 21, because we know that a defendant, we know we call this person a defendant starting from when they are indicted, but also in trial on appeal, the General Assembly even refers to defendant in the Post-Conviction Hearing Act, not so well after the conviction is final. And I think the other problem is when we interpret statutes, we look at the plain and ordinary meaning. And I think what the appellate court did just doesn't comport with how ordinary understanding of the statute would go. And I want to suggest an analogy to make this point. So if I were to use the same words, but just in a slightly different context and say, when a student over the age of 16 years receives a failing grade on an exam, she must attend study hall. I think the ordinary understanding is that the student has to be 16 when she gets the failing grade. It wouldn't make any sense to say, well, the definition of student is a person who's enrolled in school, so we have to look at the time she enrolled in the school, but she's 16 back then. That's just not how we understand those English words. So I think the text is as far as you really have to go. In this case, we've got the language of the text, we've got the ordinary understanding, and we have the canons of statutory construction. But even if there were some ambiguity in this case, we also have the history and the purpose of the statute, which support the people's interpretation. Mr. Kriegel, though, if your interpretation of the rule, it might dissuade, don't you think, young people from exercising their constitutional right to appeal a criminal conviction, simply because if the case is appealed and remanded, there's a risk that the later sentencing would be more severe than the crime? Your Honor, I don't think you have to address that question in this case, because I think there's at least an argument to be made that the defendant is convicted when he's sentenced the first time, and also convicted the second time. I don't know that you have to decide that issue here, whether there's an ambiguity that which conviction counts for purposes of the statute. It's clear that this defendant was 21 at the time he was convicted. So to turn to the history of the statute, it was enacted in 1977, and it's been amended a number of times. As we pointed out in the brief, a number of those amendments were specifically addressing issues of timing. And so we know that the legislature was closely attuned to this kind of issue. And I think the most revealing are the most recent amendments. Just last year, they took effect at the beginning of this year, where the General Assembly inserted in 23 places, through the Criminal Code and the Code of Corrections, references to a defendant who is either over or under the age of 18 at the time they committed the crime. And in particular, we have one of those instances in this very same section of the statute. The two prior felonies enhancement is subsection B. Subsection A is the habitual criminal act. And so the legislature knew what it was doing when it left those first 11 words of this enhancement the same throughout that entire history. Again, Mr. Fiegel, I was thinking that would your rules effectively force young offenders to stay with counsel, even if that counsel was ineffective, because they need to rush through the trial to avoid such harsher sentences? I'm sorry, but I'm just kind of concerned about the consequences of some of the suggestion of the rule. I understand the question, Your Honor. On the other hand, I think this court addressed in the Griffin case that, yes, with this interpretation, there is the possibility of delays, and that could affect the sentence. But the system has safeguards in place to protect against that. It has, you know, the judge can exercise his authority to move things along when appropriate. And there is certainly the understanding in Griffin that it would be improper to delay the case specifically for the purpose of getting this enhancement. And I would also point out that this problem of delay in here is in the interpretation that the appellate court applied here, because there's a three-year statute of limitations. So there is always a potential of delay between committing the crime and charging. So I don't think delay really should affect – delay should not – the possibility of delay should not affect the interpretation of the statute. It can't, as this court said in Griffin, it can't overcome the clear text. And it also shouldn't overcome the legislature's goal here, which was to account for the fact that offenders who are younger at the time of conviction will be – will have greater potential for rehabilitation and may be more susceptible to the hardening influences of prison. So for all of those reasons, the text, the history, the purpose of the statute all support the people's interpretation. The defendant acknowledges that his interpretations require implying this additional language into the statute. But he argues that because his – essentially for policy reasons, this court should adopt a different interpretation. And the rule of lenity requires that interpretation because it favors the defendant. But the rule of lenity is the rule of last resort. And this court has said that criminal statutes have to be treated just like civil statutes. We don't throw all of the canons of construction and the history and the purpose out the window just because it's a criminal case. And it's only when this court is left with no way to distinguish between two equally plausible or equally reasonable interpretations that then the rule of lenity comes into play. And in this case, when you balance the competing interpretations here, the people's interpretation has the text, history, and purpose. And the defendant's interpretations really just rely on these policy arguments. I'm happy to answer additional questions about the first issue. If not, I'll make a couple of points quickly about the cross-appeal. So in reviewing the Miranda claim, this court's review here is doubly deferential to the trial court's determination. One, because this issue is forfeited. And in order to raise an issue on plain error, it has to be a clear and obvious error. And the second is that the defendant doesn't get an opportunity to retry the suppression hearing. Even if this were on de novo review, this court would review deferentially the factual findings of the trial court. And under this court's case in People v. Patterson and the more recent U.S. Supreme Court in House v. Fields, it's clear that the general rule is a prisoner is not entitled to prophylactic Miranda warnings any time he's questioned in a prison setting. And there are two reasons for that. One is that there's just not the same danger of coercion as when you take someone who's newly arrested off the street and take him into custody. And second is that a blanket Miranda requirement would interfere with the ability of prison officials who are working in a very dangerous environment to learn about safety issues that come up in the prison. And so the question under Patterson and House is whether, under all of the circumstances, there's a serious danger of coercion to this prisoner. And I'd encourage the court to take a look at the record of the suppression hearing in this case, because the evidence just consisted of Officer Snyder's testimony. It's only less than 10 pages of the record, beginning on page 16 of volume one of the report of proceedings. And I think you'll see there really was no evidence of a danger of coercion here. So Officer Snyder testified that the defendant was housed in segregation, which was the most restrictive environment at Pontiac, that whenever he left his cell, he was required to wear handcuffs. So that was something he was used to doing. This interview lasted 15 minutes. It was with a prison internal affairs officer. He was wearing his uniform. But he testified that the defendant was free to leave. Could I ask you that? Sure. What exactly did he say? What does that mean, the defendant was free to leave? The defendant who's in penitentiary, has been in solitary confinement, is shackled and handcuffed. He's free to leave? Right, Your Honor. So the Supreme Court actually addressed this issue in the House case, and it said, of course, a prisoner is never free to just stand up and walk out of the room. I think this issue was not explored in cross-examination. The defendant obviously had an opportunity to cross-examine Officer Snyder. What did you mean by that? Did you tell the defendant that? But he didn't do that. He didn't testify himself. He didn't put on witnesses. And I think the fair inference is that the defendant understood that he could ask to go back to himself. He didn't have to answer these questions. But it wasn't explored beyond Officer Snyder's answer that the defendant was free to leave here. The defendant's reply brief makes a number of assertions that I think are not supported by the record. He argues that the defendant was yanked from his cell. He was marched to an interrogation room. He was given no choice. But there's something in the record that says that. There really is no testimony one way or the other about how this interview was initiated. And so I think at the very least, the trial court made a reasonable decision in determining that this 15-minute interview was not a more restrictive circumstance than the defendant's ordinary conditions of confinement. The defendant places a lot of emphasis on the fact that Officer Snyder's interview was not entirely about the safety of Officer Davis, who had been struck with this liquid. But I think it's important to note that neither was the interview in Patterson. If you look at Penn site 498 through 499 in the Patterson decision, the investigator there testified that the state's attorney told him also to collect this information for purposes to be used in a criminal trial. And even if there were any doubt after Patterson and Howe's involvement, the prisoner was interviewed by two police officers who were clearly investigating a sexual assault. They took the prisoner out of the cell, not segregation, and interviewed him late at night for five to seven hours. And the Supreme Court said even in that situation, a Miranda was not required. And so for those reasons, the defendant can't prevail on this Miranda issue. He also, of course, has to show either of the prongs of plain error. I'm happy to answer questions about that. Otherwise, I will rest on my boots for the moment and sit down if there are no other questions at this time. Thank you, counsel. May it please the Court. Stephen Flom with Andrew May on behalf of the defendant, Annapoli Matthew Smith. Before addressing the enhanced sentencing issue on which the Court granted review, I'd like to address the threshold question that we've raised by way of cross-relief, namely whether this conviction should be reversed. That issue, of course, turns on whether the defendant's statement given after not being Mirandized should be suppressed. And at the outset, I do want to make sure that the entire Court is aware that yesterday we received leave to file our cross-reply brief that's focused on Miranda issues. I'm not sure whether or not the Court has already received the brief that we had submitted earlier. But if you haven't, we will be submitting, of course, paper copies later this week. And I do want to make sure that everyone is aware that the cross-reply brief is coming if you don't already have it. We received a brief this morning. This morning. Okay. Okay. This year marks the 50th anniversary of the U.S. Supreme Court decision in Miranda v. Arizona. Next year will mark the 25th anniversary of the only two times that this Court has had the opportunity to address the issue posed by request for cross-relief, namely the application of Miranda to someone who's incarcerated. In those two cases from 1992, People v. Patterson and People v. Easley, this Court held applying or analyzing the peculiar facts of those cases. This is a very fact-specific inquiry. The Court reached different results. Patterson, the Court, of course, concluded that Miranda was not applicable, and Easley concluded that it was. The facts of this case are much more like Easley than they are like Patterson. For starters, of course, Miranda applies to custodial interrogations. And unlike Patterson, there is no question in this case that the interrogation requirement says Mr. Smith was interrogated. It was not an investigation. The testimony by Officer Snyder was that he asked him what did he do. He wanted to know. He was trying to elicit either a statement that yes, I did it or no, I didn't. He was trying to pin the rap on him. This was not an investigation like in Patterson where it was an entirely different motivation. The key aspect of the questioning in Patterson was that the individual had been found with check, and there was concern that that was an indication that he was at risk, physically at risk. And the investigator wanted to find out who are you concerned of? Is there something we should be doing to protect you? In that instance, there was a policy that came directly from the state's attorney. Don't read individuals in this position. Miranda writes because they tend to clam up, and we're trying to help them. No one could suggest that Officer Snyder was trying to help Matthew Smith. He was trying to get a confession, and it was only for that purpose that he chose not to read him the Miranda warnings. So the trial court's conclusion here that this was an investigation and not an interrogation, that was the only basis of its conclusion, that was clearly wrong. And contrary to what counsel said about the standard of review, the ultimate legal question here about whether the motion to suppress should have been denied, that is a question that's subject to de novo consideration by this court. And in any event, there are no disputed facts here, no material facts here. We all know what the evidence is clear of what happened. So really the Miranda issue turns on whether or not Mr. Smith was in custody when he was interrogated by Officer Snyder. The decisions by this court, as well as the decision by the United States Supreme Court in House v. Fields, teach that the touchstone for custody is the extent to which the circumstances were coercive. Coercive like your typical station house interrogation. The facts show that the circumstances here were powerfully coercive. The evidence, again, is undisputed. Officer Snyder himself testified. He went to Mr. Smith's cell. He was in segregation at the time. He placed him in handcuffs. He took him to an interrogation. Now, it seems to me it's a fair statement. As far as that has been gained from his cell and marched through his room, I don't think it was a stroll. He was in handcuffs. He took him to a small room, a health care unit holding tank. The evidence showed he had a desk and two chairs. Officer Snyder, unlike the individual who did the questioning in Patterson, he was a uniformed corrections official with his badge and uniform on display. He kept Mr. Smith in handcuffs, and he proceeded to ask him questions about what happened. And under the Department of Corrections regulations, if Mr. Smith had declined to answer those questions, if he had chosen to remain silent, he would have been subject to all kinds of discipline, serious discipline. He was subject to a loss of one year good time credit. Is that in the record? Is all of that in the record, sir? Pardon me? Is that in the record? What? The implications of failing to answer the questions? What is in the record or what the court can take judicial notice of is the Department of Corrections regulations. The Department of Corrections regulations, as we cite them in our briefs, have the offense of impeding or not cooperating with an investigation, and the Department of Corrections regulations show the punishment for that, which, as I said, includes up to a loss of one year good time credit and up to a loss of one year in segregation. So when Officer Snyder proceeded to ask Mr. Smith his questions, what he was essentially saying to him was, if you don't answer, you may spend another year behind bars. Would the defendant have known that? This defendant clearly did, Your Honor, and we appreciate that we've been given leave to supplement the record to make that even more clear than it might otherwise be. The state produced in discovery that it should have been in the appellate record, and I'm sure there was an oversight that it wasn't there because portions of the same disclosure to the accused made it into the record, but a key document for these purposes did not. So we will file, of course, give us leave to file this motion to supplement the record. This is what we wanted to include in our supplementary appendix, and I apologize for creating some, I guess, problems with that. The Post Office didn't like the supplementary appendix. But the one page excerpt from his disciplinary card showed that this defendant knew full well that if he failed to answer the questions that Officer Snyder posed to him, he could be punished. How do we know that? Because that's exactly what had happened to him before. In 2009, he'd been assaulted in prison, and he was questioned about that because they wanted to find out, the officials wanted to find out, who assaulted him. Mr. Smith refused to decline to divulge the identity of his assailant, and the disciplinary card from the Department of Corrections shows that he was punished for that. We see the loss of privileges and a variety of punishments. So he, this particular defendant, maybe even more so than we're averaging, but he clearly knew that if this man sitting across the desk from him in a small room who had marched him there and kept him in handcuffs, if he didn't answer his questions, he was subject to serious consequences. And if that's not coercive, if that's not powerful coercive, what could be? That's much stronger, even, than easily, where the court found that Miranda did apply. So the ultimate test here. Well, the court was right, though, right? I mean, he would have been handcuffed if he was taken to the showers, right, Mr. Fong? Yes, he would have been, Your Honor. And they said that he was in a less restrictive environment than he would have been if he was in his cell. Well, the court said that, but I don't believe the facts support that. And, of course, that one consideration, even if it were true, wouldn't be dispositive. Was there evidence to the contrary on that point? Yes, because in his cell he's not handcuffed. In the room he was handcuffed. And really, you know, if you're in your cell, you can lie down, you can take a nap, you can read, you can do whatever you want to do, but you are not in a situation where a man with a badge is asking you questions and if you refuse to answer to him, you're subject to spending up to another year behind bars. The other point they made about the handcuffs was that he was being interviewed regarding the possibility of a battery of another inmate, right? Was that the case? In this particular instance? Yeah. No, no, I don't believe that was the case. The officer Snyder testified that he was asking him, the whole purpose of the questioning was to ask Mr. Smith about the inmate. Battery of another officer. That's correct. Yeah, I'm sorry, I misspoke. And they said that was reasonable with conducting that type of interview for the defendant to be handcuffed. Wouldn't that be reasonable if you're talking to somebody about potentially beating up another officer and you're an officer, wouldn't you want the person handcuffed? It may well be reasonable, Your Honor, but under the totality of the circumstances, it was coercive, and that's the key for whether or not he was considered handcuffed. Well, those are the circumstances. And that's right. And so it is coercive.  Officer Snyder might well have been a reasonable decision for him to keep him in handcuffs, but under the totality of the circumstances, it was unreasonable for him not to read him his Miranda words. If he wanted to march him to that small room and ask him questions and keep him in handcuffs and subject him to the possibility of additional imprisonment, additional time in segregation, if he didn't answer the questions, that's fine, but he's got to read him his Miranda words because it's coercive. And that's what we're talking about here, is coercive. Justice Tice alluded earlier to another consideration that further demonstrates the coerciveness here. There was no evidence here that Officer Snyder ever suggested to Mr. Smith free to leave. And certainly to a reasonable person in Mr. Smith's position, and that is the frame of reference, he would not have believed that. He didn't have any choice. Unlike Patterson, who agreed to be interviewed, for example, Mr. Smith had no choice about being interviewed. He was taken, handcuffed, taken to this room and questioned. He was kept in handcuffs. Who would have thought under those circumstances that he had said, oh, by the way, thank you for the opportunity to chat, but I'd really rather go back to myself. Who would have thought that he had that power, that actually that Snyder would have gone along with that? It doesn't make any sense. So that consideration again, there was no reason for Mr. Smith to believe that he could terminate this. He didn't start it. He didn't reasonably believe he could end it. Does the court have to just reject out of hand the officer's testimony, which is the only testimony with regard to whether the defendant was free to leave? Do they just reject that out of hand with no contrary testimony saying that's not reasonable to believe? No, Your Honor, because the question isn't whether or not Officer Snyder had some hidden belief that if Mr. What matters is that there is no evidence that Officer Snyder communicated that to Mr. Smith. If he had said to Mr. Smith, I'd like to ask you a few questions, but if you don't want to talk to me, I'll take you back to yourself, that would be different, or at least that would be one consideration that was an important consideration that was different. But nothing like that happened here. Whatever he might have secretly believed about whether or not it could have been terminated was never communicated to Mr. Smith, and that was part of what made this interrogation so coercive. So Officer Snyder chose not to read Mr. Smith's Miranda warrants. He never offered any explanation for why, and we know why it wasn't done in Patterson. That was a good reason to try to protect the individual. We're concerned about his safety. Nothing like that here. With regard to the issue of custody and being in a less restrictive or a more restrictive environment, is our point of reference his cell, or is our point of reference any other time he's taken from the cell and whether he's handcuffed and that type of thing? The point of reference would be his cell, and again, in the cell he's not cuffed. There was evidence that inmates in segregation are placed in handcuffs when transported. There was no evidence that they're always kept in handcuffs whenever they're out of their cells. And so certainly, again, all of it goes back to what kind of pressure was being placed on the individual who was being interrogated to speak, to give up their Fifth Amendment right, and to be taken from a place where you're not in handcuffs, where you're free to do whatever you want to do, and most importantly, where you're not being asked questions by someone who's trying to give them a rap on you. That is far more coercive of the circumstances of this interrogation than the circumstances in which he was normally. So ultimately, what we're looking at here is the totality of the circumstances. And in House versus Fields, the U.S. Supreme Court indicated that the relevant standard is under the totality of the circumstances. Do they present a serious danger of coercion? And I submit to you that the totality of the circumstances here presented overwhelming, not just serious danger of coercion. Therefore, this was a custodial interrogation, and Miranda writes, as in easily should have been read to Mr. Smith before Officer Snyder chose to question him. Let me say a few words about plain error. Both prongs of the test are satisfied here. We've already talked about error. Let's talk about the first prong that is closely balanced evidence. I really can't overstate the significance of the incriminating statement that was introduced into evidence regarding what Mr. Smith allegedly told Officer Snyder. No one, not even Officer Davis. This is the person who, the corrections officer who had the unidentified liquid, which from all we can tell is apparently just water. I mean, my client got sentenced to an additional six years behind bars for apparently throwing water on a corrections official. And the admission of the confession here made all of the difference in what was otherwise a closely balanced case, really, frankly, a very weak case. The officer who had the liquid apparently thrown on him didn't see anyone, Mr. Smith or anyone else. He didn't see him do that. And Officer Davis's explanation of what happened was equivocal at best and contradicted by the other state's witness, Officer Snyder. Initially, Officer Davis said, I don't know how it happened. That is, how could Smith have gotten water on him? He didn't know. But then, prompted by the state's attorney, he had a theory. His theory was that the liquid could have come through the crack of the door. Well, the crack of the door? Officer Snyder testified that these doors in the segregation unit, they have perforated holes, but there's plexiglass behind them. That would have prevented liquid from going out. Officer Snyder said if the door was cracked open, then there could have been some liquid that could have gone out. There was no evidence here that Mr. Smith's cell door was cracked open. Officer Davis didn't say that. And that doesn't make any sense that it would be. The man was in segregation. Why would his cell door be left open? So there was no evidence of that. And that's not the only reason why Officer Davis's description of what happened just doesn't make sense. He testified that he was unprovoked, and that he was really upset that this liquid had gotten on his side. So what would a normal person do if suddenly you're upset about someone tossing the water out? Certainly, in a minimum, you'd exchange words with the person. You'd say, you know, for crying out loud, why did you do that? You would have said something. And presumably, they would have said something in response, or maybe they would have chosen not to. Mr. Davis didn't testify that anything like that happened at all. All that he said was, I went to talk to my supervisor, and then I went to see the nurse, and I got washed up. That doesn't make any sense. That's not what normal people would do if they really get assaulted in some fashion like this. So in the facts of this case, you've got Davis's equivocal and really illogical testimony to introduce evidence of Mr. Smith supposedly telling Mr. Snyder, I did it, and I did it because he didn't give me a shower. As this court has noted, confession is the most powerful evidence that there is. Your time has expired. Thank you. Just a couple of points. First, the defendant doesn't discuss the first issue in this case. So that issue is forfeited. On the Miranda issue, I would go back to the first thing I said about the issue, which is that you're reviewing this case on plain error and giving deference to the trial court's factual findings. And it's hard to see, based on the ten pages of the record that the trial court had in front of it, what other determination he could have come to, or I think it was she could have come to. It's not coercive for a prisoner to be in handcuffs if the testimony is that's how he is every time he leaves the cell. To answer the question about the point of reference, I think that Patterson shows you're looking at what are the conditions of confinement generally, and the prisoner is, I would assume, regularly leaving his cell to go to the yard to get a shower, whatever it is, and in all of those instances, he's in handcuffs. There's nothing in the record about, did Officer Snyder say, would you mind going to talk to me about this case? Maybe he did. It's not in the record. The only evidence that we have is he said that the defendant was free to leave. Now, the defendant argues that's not credible, but he didn't challenge Officer Snyder about that testimony. When he had the opportunity. It's also not in the record that there was this previous disciplinary proceeding hanging over the defendant's head that was coercing him into giving a confession in this instance. There was the exact same facts in Patterson. There was the possibility that the defendant in Patterson could have been disciplined for not cooperating with the investigation, but there was no evidence in the record that there had actually been charges filed in that sort of circumstance, and people have never had an opportunity to cross-examine or to challenge or to explore the meaning of the document that the defendant says he wants to have supplemented in the record. There's no oversight failing to include that discovery in the record. Is there anything in the record with regard to why he was in segregation to begin with? There is not, Your Honor. The record is just that he was in the most restrictive environment. Of course, it is in the record that one of his previous two convictions was for having a weapon in prison, so it may have been related to that. On the question of plain error, I think it's important to, on the first prong of plain error and whether the evidence was closely balanced, I think it's important to remember that this was not a two-week murder trial. This was a one-day trial about a battery, and there really was no other explanation for what happened. Officer Davis didn't have the most clear memory of what happened, but he knew he was standing next to the defendant's cell and that all of a sudden he was covered in water and there was nowhere else that the water could have come from. The cells were all in a row on one side of the gallery, and there was just a railing behind him. There were no cells above him, so it couldn't have come from anywhere else. There was corroboration from the nurse that she saw him wet shortly after this took place, and Officer Davis followed protocol by going to his supervisor and going to the health care unit. So certainly confessions are often important in cases, but in this case it really couldn't have made the decisive difference because there just wasn't another explanation. I am happy to answer other questions. There do not appear to be any other questions, Counsel. Thank you very much. Thank you. In case number 119659, people of the state of Illinois v. Matthew Smith, will be taken under advisement as agenda number two. Thank you for your arguments this morning. You're excused at this time.